United States Courts
Southern District of Texas
FILED
OCT 31 2024
Nathan Ochsner, Clerk of Court

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | |
|---|---|
| In re:<br><br>J. C. PENNEY DIRECT MARKETING SERVICES, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-20184 (CML)<br><br>(Jointly Administered)<br>(Formerly jointly Administered under J.C. Penney Company, Inc., 20-20182) |
| ERIC LYNDELL MOORE,<br><br>Plaintiff,<br><br>v.<br><br>COPPER PROPERTY CTL PASS THROUGH TRUST,<br><br>Defendant,<br><br>PENNEY INTERMEDIATE HOLDINGS LLC,<br><br>Defendant. | Adversary Proceeding<br><br>No. 20- ____________ |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Eric L. Moore, a 1st and 2nd Lien Secured J.C. Penney Bondholder, and Joinders[2] file this Complaint for Declaratory Judgment (hereinafter, "Complaint") against Copper Property Trust and Penney Intermediate Holdings LLC. As the basis for this Complaint, Mr. Moore states the following:

**NATURE OF THE ACTION**

1. In connection with the Debtor's chapter 11 cases, this adversary proceeding seeks a declaratory judgment that:

[1]A complete list of each of the debtors in these chapter 11 cases may be obtained on the website of the debtors' claims and noticing agent at http://cases.primeclerk.com/JCPenney. The location of debtor J.C. Penney Company, Inc.'s principal place of business and the debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Plano, Texas 75024.
[2] Michael Wachs, Barnett Capital and the ad-hoc Equity Committee have joined this Complaint.

a. The Fair Market Value of the PropCo real estate collateral that secured the DIP and 1st Lien claims was–per the Court's prior order–determined by GLAS (the Copper Property Trust Trustee) to be no less than $1.93 Billion as of the Effective Date, January 30, 2021. (See Exhibit B)

b. Per the Sale Order, no public auction of the J.C. Penney operating company ("OpCo") or its real estate assets ("PropCo") occurred. A private sale and/or a liquidation occurred and is ongoing.[3]

c. The Honorable Judge Marvin Isgur ("Judge Isgur") did not approve a settlement agreement that authorized the DIP Lenders to receive 90% of the Debtor's assets, regardless of value.

d. The Bondholders' liens are still attached to the assets that were transferred to Copper Property Trust (PropCo) and Penney Intermediate Holdings LLC (OpCo), as they are/were secured creditors up to the remaining amount of unpaid 1st and 2nd lien debt.

## JURISDICTION AND VENUE

2. The United States Bankruptcy Court for the Southern District of Texas has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2).

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and 1409.

4. This adversary proceeding is commenced pursuant to Rule 7001(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section 105(a) of title 11 of the United States Code (the "Bankruptcy Code"), 11 U.S.C. § 105(a). Declaratory relief is appropriate pursuant to Bankruptcy Rule 7001 and the Declaratory Judgment Act, 28 U.S.C. § 2201.

[3] See Dkt. 1814, Pages 7-8, Section K, "Private Sale is Appropriate"

5. Pursuant to Rule 7008-1 of the Bankruptcy Local Rules, Plaintiff Eric L. Moore consents to entry of a final order or judgment with respect to this Complaint if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## PARTIES

6. Plaintiff Eric L. Moore is an individual residing at 202 Island Avenue, San Diego, California 92101.

7. Defendant Copper Property Trust is located at 3 Second Street, Suite 206, Jersey City, NJ 07311.[4]

8. Defendant Penney Intermediate Holdings LLC/Simon Property Group/Brookfield Properties is located at 225 W. Washington Street, Indianapolis, IN 46204 and/or 250 Vesey Street, 15th Floor, New York, NY 10281.[5]

## FACTUAL ALLEGATIONS

9. On May 15, 2020, the Debtors and their various subsidiaries filed bankruptcy, listing roughly $8.4 Billion in assets and showing roughly $5 Billion in funded debt. J.C. Penney was a solvent company with no near-term debt due, that was holding $475 Million in cash[6] and $1.4 Billion in unencumbered real estate.

10. J.C. Penney management used the pandemic as an excuse for a Chapter 11 filing in order to put insiders Spence Haber of H/2 Capital and his friend David Simon of Simon Growth Properties, in position to steal over $7 Billion in assets.[7]

[4] Upon information and belief, Copper Property Trust is a pass through trust formed by J.C. Penney's DIP Lending Parties and 1st Lien Noteholders to receive rental payments from the operating company ("OpCo") and to liquidate company assets/Creditors' collateral.
[5] Upon information and belief, Penney Intermediate Holdings LLC is a subsidiary joint venture between Simon Growth/Brookfield formed to purchase the operating assets of J.C. Penney.
[6] See Dkt. 1268, Page 1, Paragraph 1
[7] J.C. Penney management sold most, or all, of their stock less than 14 days prior to the bankruptcy filing.

11. Because the Debtors had so much cash and no debt due until July of 2023, they did not need a DIP loan. However, at the insistence of 1st Lien debt majority owner H/2 Capital, they rolled up $450 Million of their 1st Lien debt and put another $450 Million in escrow, for a total DIP loan of $900 Million.

12. Prior to the commencement of the J.C. Penney bankruptcy, the Debtor's attorneys (Jackson Walker and Kirkland & Ellis) selected the Honorable Judge David R. Jones ("Judge Jones") to oversee the case. Text messages have been uncovered between Jackson Walker attorneys indicating that Judge Jones was their preferred judge and that they maneuvered to land the bankruptcy in his court.

13. This was done so that the law firm Milbank LLP could facilitate a multi-billion dollar heist in which insiders/majority 1st Lien Bondholders (such as Spencer Haber of H/2 Capital and his friend David Simon of Simon Growth Properties) would receive all of the Debtor's more than $8 Billion in assets for no more than $1 Billion, which was offered in the form of a credit bid of the (unnecessary) DIP debt.

14. <u>This $7 Billion theft could not have been accomplished</u>:

(a) If Judge Isgur had been on the bench instead of Judge Jones. Text messages between attorneys at Jackson Walker (a Houston-based firm that served as Debtor's co-counsel) have been uncovered, stating that J.C. Penney couldn't afford to go in front of a "process hawk" like Judge Isgur and indicating that attorneys at the firm were trying behind the scenes to keep the case away from Judge Isgur and to get it before Judge Jones. Judge Jones had a special relationship with Jackson Walker partner Elizabeth Freeman, who was his secret live-in girlfriend of many years and was

living with him at the time.[8] In texts to a colleague regarding the J.C. Penney case, Freeman stated that Judge Jones had been "softening up for this for a month." She also affirmed, "Talked to Jones. He's got us," and, "We are keeping this down looooooooow."[9]

(b) If the Debtor had disclosed to Creditors and to the U.S. Trustee the real valuation of its assets, including its cash position and the value of its real estate and operating company.[10]

(c) If the lawyers representing in-the-money Secured and Unsecured Creditors were not threatened with disfavorable rulings, and/or promised favorable rulings in front of Judge Jones in other cases in the future based on their cooperation.[11] In this case, they were expected to stand down and offer no more than the $1 Billion that the "insiders" wanted to pay, and to file no meaningful objections concerning the true value of the Debtor's assets.[12]

(d) If the Debtor's highly profitable and solvent business had been put up for sale in a public auction, as this would have garnered offers much higher than $1 Billion.[13]

---

[8] The fact that Judge Jones was the preferred judge to handle the J.C. Penney case came out in texts in the legal matter concerning the clawback of legal fees. (Case No. 23-00645, *In re Professional Fee Matters Concerning the Jackson Walker Law Firm*.)

[9] See 10/17/24 Bloomberg article by James Nani, "Judge's Girlfriend Texts Indicate JCPenney Bankruptcy Maneuver"

[10] Lazard's David Kurtz testified that they did no formal valuation of any of the Debtor's assets, despite receiving $23 Million to market and promote those assets.

[11] Lawyers for Akin Gump informed Plaintiff on a call that PropCo had been given a "shit valuation." They implied they had no choice but to go along, referring to articles in the Wall Street Journal that exposed the relationship between Judge Jones and Elizabth Freeman.

[12] Threatening potential bidders with repercussions if they made a bid and/or outbid others is what caused the indictment and conviction of bankruptcy lawyer Daniel Kaminsky in the Neiman Marcus case. See *In re US v Kaminsky*. The Fact that other constituencies would not join the equity committee motion is covered in this podcast by the financial advisors for the Debtors: https://podcasts.apple.com/us/podcast/the-jcpenney-bankruptcy-an-inside-view-from/id1559079315?i=1000513581651

[13] No public auction occurred in this case. See Dkt. 1814, Page 7 "Private Sale is Appropriate'

(e) If the Debtor's own lawyers had not argued that the Debtor's liquidation value was much less than $8.4 Billion.[14]

(f) If the Debtor had filed a liquidating analysis as is required by Section 1129(a)(8) of the Bankruptcy Code, showing that Creditors would recover more in a liquidation than in the alleged private sale.

15. The Debtors hired the financial advisory Lazard to allegedly market and promote the company for sale. Although they were contracted to receive up to $23 Million for selling J.C. Penney whole or in part, Lazard's David Kurtz admitted at the sale hearing on November 9, 2020, that they had no valuation for J.C. Penney's extensive real estate portfolio and no valuation for the company's robust operating business, and that he was unaware of anyone else having put a dollar value on the sale. (See Exhibit C)

16. The only formal valuation of the J.C. Penney assets was conducted by the Equity Committee's financial advisors, William Synder and Dawn Ragan (both of CR3 Partners). They found that the Debtor's assets were worth at least $8 Billion, and potentially as much as $10 Billion. This valuation, exceeding $8 Billion, is in line with what the Purchasers of the assets (the DIP Lenders) received and eventually reported in their own audited financials. (See Exhibits A and B)

17. Legal counsel for the Unsecured Creditors Committee as well as the Trustees for the 1st and 2nd Lien Bondholders either refused to agree with, or were prevented from agreeing with, the Equity Committee's valuation; and/or they were prevented from making a bid and/or suing the DIP Lenders for stealing their clients' collateral.

[14] The Debtors made this argument at a hearing on 8/19/2020. See the recently unsealed transcript Page 18, Lines 18-22.

18. Those involved, including the Trustees for the 1st and 2nd Lien bonds, the DIP Lenders and their attorneys, the Debtors and their attorneys, as well as the attorneys hired to represent the Unsecured Creditors' Committee[15] and those hired to represent the Equity Committee, were all aware that the Debtor's assets were worth at least $8 Billion in liquidation and even more as a going concern.

19. Despite this knowledge, they stood down when they were asked to agree that $1 Billion was the combined value of the Debtor's $1 Billion in cash, plus its more than $4.7 Billion in real estate, plus its highly profitable operating business.

**A. All Bankruptcy Documents Show Only $1 Billion in Collateral Being Distributed**

20. By refusing to value the assets and avoiding a public auction scenario where there would be actual competition, the insiders and their counsel were able to present a $1 Billion credit bid as the alleged highest and best so-called "offer" or "bid" for substantially all the Debtor's assets. Technically, the key documents in the case only govern collateral up to $1 Billion. They simply ignore (and conceal) the other $7 Billion in collateral that was eventually transferred to the DIP Lenders.[16]

21. <u>The Asset Purchase Agreement</u> provides that only $1 Billion in assets is being sold. It purports to show that roughly $697 Million is being paid to J.C. Penney by the Purchasers of OpCo.[17] However, these funds were already at J.C. Penney and did not come from Simon Growth/Brookfield or any outside source. This cash was already property of the Debtor's Estate. (Dkt. 1668, Page 7)

---

[15] The Unsecured Creditors' Committee was controlled and dominated by David Simon of Simon Growth Properties, who had signed an RSA prior to the Bankruptcy to purchase the operating company for little or no cost, He made sure, along with his friend Spencer Haber, that no other parties would purchase these assets at, or near, their actual value, or argue that the assets were sufficient to pay unsecured creditors 100% of their claims.

[16] The entity that the DIP Lenders operated under, and that was established to purchase the J.C. Penney Operating Company is Penny Intermediate Holdings LLC.

[17] This was the target amount of cash to be left at the Estate. The actual number ended up being $634 Million.

22. The Sale Order provides that only $1 Billion of collateral was available for distribution to Creditors ($900 Million of DIP debt and $100 Million of 1st Lien debt). (See Dkt. 1814, Pages 8-9 "Credit Bid") **Plaintiff is not seeking to overturn the Sale Order or any other key documents, as none of them authorized the distribution of any more than $1 Billion in assets. Plaintiff's collateral was transferred illegally, without consent and without a court order**.[18]

23. The Settlement Agreement mediated by Judge Isgur provides that only $1 Billion of collateral is available for distribution (Dkt. 1814, Pages 75–86)

24. The Disclosure Statement provides that the collateral available for distribution to 1st Lien/Term Loan Noteholders was only $1 Billion ($900 Million of DIP debt and $100 Million of 1st Lien debt). (Dkt. 1647, Page 16, "Summary of Recoveries")

25. The Plan of Reorganization confirmed in the Company's Chapter 11 cases (the "Plan") provides that Class 4 First Lien Notes claims would be deemed impaired, as the collateral available for distribution to 1st Lien/Term Loan Noteholders was only $100 Million out of the $1 Billion credit bid. (Dkt. 2190)

26. The November 1, 2023 Status Update filed by the Wind-Down Debtors, provides that only $1 Billion in collateral was actually distributed to Creditors.[19] It says, "Based on the assets available for recovery, Class 4 Claims cannot be paid in full."[20] (Dkt. 1245, Page 5)

27. Lazard's David Kurtz, the Debtor's Investment Banker, testified at the Sale Hearing on November 9, 2020, that Lazard did not do a valuation of the Debtor's operating

[18] This is why Count III of this Complaint seeks the imposition of a Constructive Trust.
[19] The audited financials attached at Exhibits A and B prove that the amount distributed was actually over $8 Billion
[20] This report reflects that the Debtors paid off just $1 billion and are still billions in debt. However, the Purchasers' audited financials attached at Exhibits A and B demonstrate that the Debtors transferred $8 billion in collateral.

business (OpCo) or its real estate holdings (PropCo). This is highly unusual and improper. (See Exhibit C)

**B. In a Private Sale, Fair Market Value is Governing for Secured Creditors**

28. The primary issue in this case is straight-forward: The 1st Lien and 2nd Lien Bondholders' collateral is to be valued at Fair Market Value, not Foreclosure Value.[21] [22] The Supreme Court,[23] The Fifth Circuit, the Sale Order, the Asset Purchase Agreement, the Disclosure Statement and Section 506(a) of the Bankruptcy Code all contain this requirement.

29. All of the key documents in this case allege that only $1 Billion in collateral is available to distribute to Creditors. However, provisions in the Disclosure Statement, Sale Order, and Settlement Agreement clearly establish that the Fair Market Value of the assets is the appropriate method for valuing the liens held by the Secured Parties.[24] [25] [26]

---

[21] See the Sale Order, Dkt. 1814, Page 47; See also the Asset Purchase Agreement, Dkt. 1668-1, Page 97, Section 9.2 "Allocation Of Purchase Price"

[22] "'The discrepancy between the two valuation standards arises because an asset's fair market value reflects "a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular . . . piece of property.'" *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 538 (1994) (quoting BLACK'S LAW DICTIONARY 971 (6th ed. 1990)). By contrast, foreclosure value—the "very antithesis" of fair market value—involves a forced sale for "'*the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner.*'" Id. at 537-38 (same). There is a "glaring discrepancy between the factors relevant to an appraisal of a property's market value, on the one hand, and the strictures of the foreclosure process on the other." Id. at 538

[23] The Supreme Court held that the "foreclosure value" of an asset does not fairly measure a secured creditor's interest in its collateral. *Assocs. Commercial Corp. v. Rash,* 520 U.S. 953, 955-56, 960-65 (1997); *In re Stembridge*, 394 F.3d at 386-88. The bankruptcy court's error was significant. An asset's foreclosure value usually will be substantially lower than its fair market value (alternatively referred to as its "going concern" or "replacement" value) at the same moment. See Rash, 520 U.S. at 957-58.

[24] The Disclosure Statement reads in part, "The beneficiaries of PropCo shall report consistently with the valuation of the PropCo Acquired Assets transferred to PropCo as determined by the PropCo Trustee." (Dkt. 1647, Page 71) (Underline added)

[25] The Sale Order reads at Paragraph 49, "PropCo Trust will, for tax reporting purposes, report PropCo as owning the assets it acquires at their fair market value at the time of the PropCo Closing (and the face amount underlying the Credit Bid Amount shall not be determinative of fair market value) and such fair market value shall be used by PropCo Trust and the Debtors for purposes of determining the aggregate value used for the PropCo Allocation as such term is used in Section 9.2 of the Asset Purchase Agreement" (Dkt 1814, Page 47) (Underline added)

[26] The Settlement Agreement reads in part, "...the DIP Administration Agent, and the DIP Collateral Agent have authorized and directed that PropCo Purchaser credit bid the Credit Bid Amount, on account of $900 million of DIP Obligations and an aggregate $100 million of Term Loan Obligations and First Lien Obligations, allocated ratably based on outstanding Term Loan Obligations and First Lien Obligations, which obligations are not subject to avoidance, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law." (Dkt. 1814, Page 9) (Underline added)

30. The Fair Market Value provision is established Fifth Circuit precedent[27] and is codified in Section 506(a)[28] of the Bankruptcy Code.

31. Further, it is also made clear in all of the key documents in this case that the Credit Bid Amount of $1 Billion does not control the value of the assets for tax purposes, and/or that the Debtors and the Beneficiaries of the PropCo assets must report *consistently* with the Fair Market Value of the PropCo assets as determined by the PropCo Trustee (See Dkts. 1814, 1668, 1647)

32. The Fair Market Value of the PropCo real estate ($1.93 Billion) is a judicially-determined valuation for the 1st Lien/Term Loan Secured Creditors. Copper Property Trust has referenced this judicially-determined valuation amount in every report it has filed with the SEC since the Effective Date. However, this number has intentionally been concealed from the U.S. Trustee and the Creditors by Brian Kinney of Milbank LLP.

**C. The DIP Lenders' Audited Financials Reveal Distributions of Over $8 Billion**

33. Audited financials filed by the DIP Lenders/Purchasers, reveal that the Debtors transferred no less than $8 Billion in businesses, brands, real estate and inventory–including $1 Billion in cash–to the DIP Lending Parties on the days of the sales.[29] This is despite alleging in all of the key bankruptcy documents, that on the very same day, there was only $1 Billion available to distribute to Creditors.

[27]See *In re T-H New Orleans Ltd. Partnership*, 116 F.3d 790 (5th Cir. 1997): In this Fifth Circuit case, the court addressed the valuation of collateral in a bankruptcy context, noting that Section 506(a) requires that the creditor's secured interest be valued according to the FMV of the collateral at the time of bankruptcy. This applies regardless of the sale price in a private sale, emphasizing that the creditor's lien attaches to the value of the collateral, not merely the price it fetches at sale.

[28] Section 506(a)(1) States: An Allowed claim of a creditor secured by a lien on property in which the estate has an interest... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property...and is an unsecured claim to the extent that the value of such creditors interest or the amount so subject to setoff is less than the amount of such allowed claim.

[29] The sale closed in two parts, OpCo on December 7, 2020, and PropCo on January 30, 2021.

34. Penney Intermediate Holdings LLC's audited financials confirm that as of the OpCo closing date, the J.C. Penney Operating Company Business Inventory and Real Estate was valued at no less than $5.193 Billion. (See OpCo audited financials attached at Exhibit A)

35. Audited Financials and/or sworn testimony confirm that as of the PropCo closing date, January 30, 2021, the PropCo Real Estate and PropCo Closing Cash were $1.93 Billion and $360 Million, respectively. This means that roughly $2.36 Billion in PropCo cash and real estate was available to be distributed to the DIP Lenders and 1st Lien Holders at that time. (See PropCo Audited Financials at Exhibit B and Lazard's David Kurtz's sworn testimony at Exhibit C)

36. The Debtors knowingly and willingly transferred more than $8 Billion in cash, inventory and real estate, operating businesses and brands, to the DIP Lenders for a credit bid of merely $1 Billion. J.C. Penney's Total Funded Debt was $5 Billion,[30] meaning that even Shareholders are due a recovery of over $2 Billion. J.C. Penney was a solvent company masquerading as an insolvent one.

**The Debtors' Prepetition Capital Structure**[31]

| Facility | Maturity | Amount Outstanding |
|---|---|---|
| **J. C. Penney – First Lien Debt Obligations** | | |
| ABL Credit Facility | 06/20/2022 | $1,179 million |
| 2016 Term Loan | 06/23/2023 | $1,521 million |
| First Lien Notes | 07/01/2023 | $500 million |
| **J. C. Penney – Second Lien Debt Obligations** | | |
| Second Lien Notes | 03/15/2025 | $400 million |
| | **J. C. Penney - Total Secured Obligations** | **$3,600 million** |
| **J. C. Penney – Unsecured Obligations** | | |
| Unsecured Notes | Varying (2023–2097) | $1,318 million |
| | **J. C. Penney – Total Funded Debt** | **$4,918 million** |

[30] Dkt. 25, Page 36; See also "The Debtor's Prepetition Capital Structure" excerpt from Dkt. 25 above
[31] Dkt. 25 , Page 36

37. The underpaid 1st Lien/Term Loan Noteholders are owed roughly $1.47 Billion more than they have received. Plaintiff Eric L. Moore, a member of this class of Creditors, is not seeking to overturn the Sale Order or the Confirmation Order, as has been repeatedly alleged by the overpaid DIP Lenders and the Wind-Down. These orders did not authorize the improper distribution of his collateral to the DIP Lenders.

**D. The Auction That Never Occurred and the Liquidation of the Debtor's Assets**

38. The Debtors assert that $1 Billion was the "*highest and best offer*" for their assets, implying that an auction took place. Their financial advisor testified to bids and "bidders," for similar effect. By pretending that the transaction was an auction, they hope to convey the idea that other interested parties–not just the insiders who ended up with substantially all of J.C. Penney's assets–participated in a fair competition to win the "bid." However, this was not the case. Lazard did not market and promote the assets and the proposed transaction by the insiders to outside parties.

39. Other benefits of pretending there was a competitive auction include the presumption that a fair price was paid for the assets. Even if the price was lower than what might be fetched under ideal circumstances, a fair value is <u>established</u> as a result of a competitive auction process.

40. The Debtors and the officers of the court in this case were all aware that there was a lowball price that the insiders (H/2 Capital, Brigade Capital and other DIP Lenders) were willing to offer–in the form of a credit bid–and that was going to be the "highest and best" bid, because others were not allowed to participate in the process without repercussions in other cases with Jackson Walker and Judge David Jones and/or Kirkland & Ellis.

41. However, a credit bid in a private sale cannot be exchanged for more than the amount of the credit bid, which in this case was $1 Billion. Therefore, of the $8 Billion in assets, $1 Billion was transferred to the DIP Lenders in exchange for their credit bid, and $7 Billion was transferred without consideration.

42. Not only was there no auction, there was technically no sale of $7 Billion of the Debtor's assets, because no funds came in from any outside source to purchase anything above $1 Billion. Therefore, although the Sale Order names a Private Sale, this only applies to the $1 Billion in collateral that were exchanged for the $1 Billion credit bid.

43. The Debtor's remaining assets were transferred without consideration. This is similar to a person paying for a suitcase, but not paying for the furs and jewels they shoplifted and stuffed inside the suitcase before the purchase at the register. The suitcase was paid for, but this was only done to cover up a much bigger heist.

44. **<u>No outside funds came in from the Purchasers to the Debtors</u>.** This was simply a liquidation of the Debtor's cash and assets and a loan against the Debtor's ABL facility, orchestrated by insiders and distributed to the DIP Lenders in violation of absolute priority.

45. In a liquidation scenario, absolute priority still governs, and the DIP Lenders are still in possession of other Creditors' property that was never paid for. Therefore, as a remedy, Plaintiff is seeking the imposition of a constructive trust.

46. Of the Debtor's $8 Billion in assets, $100 Million went to 1st Lien Holders and $7.9 Billion went to the DIP Lenders.[32] This is a violation of the absolute priority rule, among other violations.

---

[32] See the audited financials included in this Complaint at Exhibits A and B and the November 1st, 2023 Status Update Report

47. The distribution of more than $7 Billion in collateral above the credit bid amount was not a part of the $1 Billion credit bid. These distributions were not voted on by Creditors, as no Chapter 11 plan or disclosure statement was ever presented to disclose that this additional $7 Billion in collateral was available for distribution.

48. Distributions to the DIP parties were legally limited to the amount of their claims as Creditors. U.S. Bankruptcy Court 11 U.S.C. § 363(k) reads:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property. (Underline added)

49. The Confirmation Order,[33] Disclosure Statement,[34] and Settlement Agreement[35] erroneously show that the DIP and 1st Lien debts were secured by only $1 Billion in collateral. Years later, on November 1, 2023, the Status Update Report still alleged that only this $1 Billion in value was available.[36] This is not a mistake. Over $7 Billion in collateral was intentionally valued at Zero and transferred to the DIP Lenders at no cost, with the cooperation of teams of attorneys and under the supervision of a compromised court.

50. Furthermore, according to the Purchasers' audited financials, which reveal the actual value of the Debtor's concealed assets, none of the parties who were listed in the Disclosure Statement as "impaired" were actually impaired. Therefore, none of them should have been allowed to vote on the Plan. Beyond that, J.C. Penney was a solvent company that was liquidated and essentially gifted to H/2 Capital and Spencer Haber's insider friend David Simon of Simon Growth Properties.

---

[33] See Doc 2190
[34] See Dkt 1647
[35] See Dkt 1814
[36] See Dkt. 1245

**E. The DIP Lenders' $900 Million Credit Bid Did Not Buy $8 Billion of Assets**

51. The DIP Lenders, led by Spencer Haber of H/2 Capital, offered a joint Credit Bid of $1 Billion ($900 Million of DIP debt and $100 Million of 1st Lien debt) to allegedly purchase substantially all of the Debtor's assets.

52. The DIP Lenders and 1st Lien/Term Loan Noteholders had liens on substantially all of the Debtors assets up to the amount of their combined claims, which totaled roughly $2.5 Billion ($900 Million in DIP debt and $1.6 Billion in 1st Lien debt).

53. Because the DIP Lenders and the 1st Lien Holders controlled up to $2.5 Billion in combined debt, they had the right to credit bid some or all of this amount –but not more–as their liens did not extend to collateral exceeding their collective $2.5 Billion debt amount.

54. Section 363(k) only allows a credit bid up to the amount of the debt. In this case, due to Judge Jones's girlfriend's firm, Jackson Walker, selecting him to oversee the case, the DIP parties were gifted $7 Billion in assets, including $1 Billion in cash without objection from parties who were compromised and/or afraid of repercussions in other cases adjudicated by Judge Jones.

**F. Debtors Valued J.C. Penney Operating Company's Assets at Zero**

55. Lazard's David Kurtz, the Debtor's Investment Banker, testified at the Sale Hearing on November 9, 2020, that Lazard did not do a valuation of the Debtor's operating Business (OpCo) or its real estate holdings (PropCo). This is highly unusual and improper. (See Exhibit C)

56. The Disclosure Statement suggests that a $1 Billion credit bid could be used to bid for **all**, or some, of OpCo. The Disclosure Statement reads in part:

> The range of recoveries set forth herein for Holders of Allowed First Lien Secured Claims (a) assumes illustratively, that (x) on the one hand, all of the Credit Bid Amount is assigned to the OpCo Purchaser at the OpCo Closing (thus establishing the low end of the range of recovery for Holders of Allowed First Lien Secured Claims on account of

distributions contemplated to be received under the Plan) and (y) on the other hand, all of the Credit Bid Amount is credit bid at the PropCo Closing (thus establishing the high end of the range of recovery for Holders of Allowed First Lien Secured Claims on account of distributions contemplated to be received under the Plan); (b) does not take into account the reduction in the Allowed Claim amount following the assignment and application of the OpCo Credit Bid Amount; and (c) only takes into account distributions to Holders of Allowed First Lien Secured Claims to be made under this Plan. (Dkt. 1647 page 16)

57. The DIP Lenders allege to have assigned all, or a portion, of the $1 Billion Credit Bid Amount to Simon Growth/Brookfield to purchase the Operating Company.[37] However, the amount of the credit bid assignment was not disclosed, because in reality, no portion of the credit bid was used to purchase OpCo.

58. The PropCo Purchasers state in court filings that they used the full $1 Billion credit bid to buy PropCo.[38] Therefore, Zero consideration was paid for the $5.193 Billion in J.C. Penney operating company assets that were allegedly purchased by Simon Growth/Brookfield.[39] In actuality, the Debtors gifted over $5.193 Billion in assets to the DIP Lenders, including $634 Million in cash.

59. Penny Intermediate Holdings' audited financials show that on the OpCo sale closing date, December 7, 2020, the OpCo Purchasers received $5.193 Billion in assets (See Exhibit A, Page 5)

60. Copper Property Trust filed audited financials reflecting that it had received at least $1.93 Billion in real estate and $360 Million in cash as of the PropCo closing on January 30, 2021.[40] [41]

[37] See Dkt. 1647, Page 16, Paragraph 32.
[38] Dkt. 1555, Pages 2-3
[39] The consideration alleged to be paid by Simon Growth/Brookfield was all derived from property of the Debtor's estate: (1) $634M in cash (Debtors Surplus Cash after the $1.3 Billion was used to pay of the ABL); (2) $520M that was borrowed against the Debtor's now paid-off ABL, with the proceeds going to the DIP Lenders/1st Lien Holders along with a percentage of merchandise sales (Earn-Out)
[40] See Exhibit B, showing that $1.93 Billion in real estate was distributed
[41] The $360M to the DIP Lenders included the $225M borrowed under the DIP Loan plus $5M in earned interest; See David Kurtz's testimony from the November 9, 2020 Sales Hearing transcript, Page 207, Lines 9-12.

61. No matter how much, if any, of the Credit Bid was used in these purchases, the Credit Bid consideration did not exceed $1 Billion, and the asset value received by the alleged Purchasers was many times this amount according to their own audited financials. Hence, most of what was transferred in this liquidation was not paid for.

62. There were two purchasing entities for substantially all the Debtor's assets, Copper Property Trust (PropCo) and Simon Growth/Brookfield (OpCo).

63. When we add Copper Property Trust's roughly $2.3 Billion to the roughly $5.8 Billion received by Simon Growth/Brookfield, we get roughly $8 Billion in cash, real estate and businesses received by the DIP Lenders collectively, allegedly for a credit bid of only $900 Million.

| **Collateral Received by the DIP Lenders for $900 Million Credit Bid** | | | | |
|---|---|---|---|---|
| Date | Payee | Amount | Note | Total Paid Out to Date |
| 12/7/20 | Penney Intermediate Holdings LLC | $5,193,000,000 | Operating Company | $5,193,000,000 |
| 12/5/20 | Penney Intermediate Holdings LLC | $634,000,000 | OpCo Closing Payment | $5,827,000,000 |
| 1/30/21 | Copper Property Trust | $1,930,000,000 | PropCo Real Estate | $7,757,000,000 |
| 1/30/21 | Copper Property Trust | $360,000,000 | PropCo Closing Cash | $8,117,000,000 |

64. The DIP Lenders' $900 Million Credit Bid allegedly paid for the following collateral:

a. $5.193 Billion (Operating Company)

b. $634 Million in Cash (OpCo closing Payment)

c. $1.93 Billion in Real Estate (PropCo Real Estate)

d. $360 Million (PropCo Closing Cash)

65. The DIP Lenders alleged that of this roughly $8 Billion in collateral that they received, the 1st Lien Holders are only due $100 Million.[42]

66. They also allege that a Settlement Agreement between the Majority DIP Lending Group (the "Milbank Group," owning $845 Million of DIP debt) and the Minority DIP Lending Group (the "Akin Group," owning $55 Million of DIP debt)[43] entitles the DIP Lenders to 90% of all of the Debtor's assets, regardless of value, and regardless of the amount of the DIP debt and/or liens owned by other Creditors. This agreement was mediated by Judge Isgur.

67. The DIP Lenders' argument has been to assert that it is too late for them to be caught for their heist and made to return the money they stole. They have no court orders authorizing their unjust enrichment, no justification in the Bankruptcy Code and no legal argument that would entitle them to keep the collateral and/or proceeds that clearly belong to other Creditors, according to absolute priority.

**G. Ongoing Concealment of the Value of the PropCo Real Estate**

68. It is not in dispute that the DIP Lenders and the (Class 4) 1st Lien claims were the beneficiaries of the PropCo Acquired Assets. The Disclosure Statement reads in part:

> Pursuant to the Plan, on the Effective Date, the Debtors will transfer all of the Debtors' right, title and interest in the PropCo Acquired Assets and PropCo Assumed Liabilities to PropCo on behalf of the Holders of DIP Loans and Class 4 First Lien Claims. (Dkt. 1647, Page 67; Underline added)

69. The Fair Market Value of the PropCo real estate (which was judicially determined to be $1.93 Billion) has never been disclosed to Creditors nor to the U.S. Trustee or the Bankruptcy Court. This concealment has been ongoing since this scheme was conjured up by H/2 Capital with the assistance of Jackson Walker who made sure that *their* judge would oversee the

---

[42] See Dkts. 1245, 1814, 1668, 1647 and the November 1, 2023, Status Update Report

[43] These two DIP Lending groups also controlled the 1st Lien debt.

case and that the other lawyers would assist and/or stand down according to the plan concocted by Spencer Haber of H/2 Capital.

70. The value of PropCo was filed with the SEC on the closing date (January 30, 2021) as $1.93 Billion. However, to this day, it has never been filed with the Bankruptcy Court. The value of this property has intentionally been concealed from the Bankruptcy Court, as $1.93 Billion in collateral is already nearly double the $1 Billion credit bid that was allegedly exchanged for both PropCo and OpCo combined.

71. The following actions have been taken to conceal the value of the PropCo real estate from Creditors, the I.R.S. and the U.S. Trustee:

a. There was no published valuation of the real estate (PropCo) or of the operating company (OpCo) as part of the sales process.[44] The Debtor's investment banker admitted this at the Sale Hearing.

b. Attorneys for the Wind-Down and Copper Property Trust objected to a motion for judicial notice of the value of PropCo to be noticed by the Court, and the Court subsequently denied notice.[45]

c. Attorneys for the Wind-Down objected to the disclosure of the judicially-determined valuation of the PropCo collateral by Richard Robbins on cross examination. The Court sustained the objection and did not permit PropCo's value to be confirmed by Mr. Robbins.[46]

d. The Wind-Down alleged in a pleading that Fair Market Value is "fictional" and not part of Section 506(a) of the Bankruptcy Code, and denied that

[44] See Dkt. 1565, Exhibit C, Page 26
[45] See Dkts. 1525 and 1552
[46] See September 4, 2024 Hearing Transcript, Page 89, Lines 6-12

references to Fair Market Value appear in no less than three court orders in this case.[47]

72. The most egregious of the above-listed actions occurred at the hearing on Eric L. Moore's Motion to Enforce on September 4, 2024. The value of PropCo was suppressed by agents of the court. Counsel for the Wind-Down objected to the Debtor's financial advisor disclosing the *court ordered valuation* of the PropCo real estate and the objection was sustained.[48] This is similar to the results of a paternity test being disallowed at a hearing to establish paternity.

**H. First Lien Bondholders are Secured Parties Per 11 U.S.C. § 506(a)**

73. **The Asset Purchase Agreement** is clear that the 1st Lien/Term Loan Note obligations were secured by a perfected lien on the OpCo and PropCo assets. It reads in part:

> …the DIP Collateral Agent, on behalf of the DIP Secured Parties, holds a perfected first priority priming Encumbrance securing the DIP Obligations and Term Loan/First Lien Notes Collateral Agent, on behalf of the Term Loan/First Lien Notes Secured Parties, holds a perfected Encumbrance securing the Term Loan Obligations and First Lien Notes Obligations on substantially all assets of Sellers, including the OpCo Acquired Assets and PropCo Acquired Assets (collectively, the "Encumbered Assets" and such Encumbrances, the "Credit Bid Encumbrances") (Dkt. 1668-1, Page 7) (underline added)

74. The prepetition parties' liens attach at the Fair Market Value of the assets, not at a discretionary credit bid amount or an ambiguous purchase price. This is obvious, as liens as instruments would have no effect if the value of the underlying assets were arbitrarily assigned. In this case, prior court orders also specifically require that Fair Market Value, not Credit Bid Amount, be used.

[47] See Dkt. 1618, Page 5, Paragraph 8
[48] See the September 4, 2024 Hearing Transcript, Page 89, Lines 6-12

## I. Judge Isgur Did Not Give the DIP Lenders 90% of the Debtor's Assets

75. The DIP Lender defendants have alleged that the Settlement Agreement mediated by Judge Isgur entitles them to 90% of all of the Debtor's assets, regardless of value and regardless of existing liens owned by other Creditors. This is incorrect.

76. In reality, the DIP Lenders credit bid $900 Million of their debt and the 1st Lien Holders credit bid $100 Million of their debt. As stated above, there is no reference to the other $7 billion of collateral.

77. The Settlement Agreement between the Majority and Minority DIP/1st Lien Groups states that the Akin Minority Group would receive $40 Million plus $6 Million for legal fees to drop their objection to the sale. The two DIP-Holding Parties further agreed to credit bid $900 Million of their collective DIP Debt, (the full amount of that debt) and only $100 Million of their collective 1st Lien Debt (which was $1.6 Billion in total), in exchange for all of the Opco and PropCo assets.

78. **The Settlement Agreement reads in part:**

> …the DIP Administration Agent, and the DIP Collateral Agent have authorized and directed that PropCo Purchaser credit bid the Credit Bid Amount, on account of $900 million of DIP Obligations and an aggregate $100 million of Term Loan Obligations and First Lien Obligations, allocated ratably based on outstanding Term Loan Obligations and First Lien Obligations, which obligations are not subject to avoidance, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law. (Dkt. 1814, Page 9) (underline added)

79. In this case, there was a total of $2.9 Billion in DIP, 1st Lien and 2nd Lien debt against assets valued at more than $8 Billion.[49]

[49] The $2.9B debt breaks down to roughly $900M in DIP debt, $1.6B in 1st Lien debt and $400M of 2nd Lien debt. See "Debtor's Prepetition Capital Structure" table in Paragraph 36 of this Complaint

80. Nothing in the Bankruptcy Code or the Settlement Agreement authorizes the DIP Lenders to receive $8 Billion in cash, cash equivalents, inventory, businesses and real estate for a credit bid of $900 Million.

81. In fact, if 100% of the Debtor's assets were actually subject to the Settlement Agreement, this pre-plan settlement would still be required to comply with the ruling in *In re AWECO Inc.*, where the Court noted that settlements outside of a plan must comply with the absolute priority rule. (*In re: AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984))

82. Furthermore, if the Court were to find that the alleged "90/10 Split" of the Debtor's assets were governing, the 1st Lien Noteholders would be due at least another $700 Million according to the audited financials filed by the Purchasers.

**J. Plaintiff's Secured Liens Survive Despite Transfers**

83. The OpCo and PropCo assets were transferred to different entities. The PropCo assets transferred to Copper Property Trust, and the Operating Company Assets were transferred to Penney Intermediate Holdings LLC.

84. Neither Plaintiff Eric L. Moore, nor the Joinder Parties are seeking to overturn the Sale. Even though assets belonging to the 1st and 2nd Lien Secured Parties were transferred to other entities, the liens still attach to the property and/or to the proceeds of the Sale because these transfers were made <u>subject</u> to the existing liens.

85. Per the Disclosure Statement, the PropCo Acquired Assets were transferred to the DIP/1st Lien Parties "<u>subject to any obligations relating to such assets</u>," [50] and pursuant to U.S. Code § 1129(b)(2)(i)(II)(ii). (Underline added)

[50] Dkt. 1647-1, Page 67 (Underline added)

## CLAIMS FOR RELIEF

## COUNT I

**(Copper Property Trust – Declaratory Judgment Under 28 U.S.C. § 2201(a))**

86. The allegations set forth above are incorporated herein by reference.

87. An actual legal and substantial controversy exists between the parties regarding the Fair Market Value of the PropCo real estate. This value, as determined by the PropCo Trustee, was $1.93 Billion. This amount, plus the PropCo Closing Cash of $360 Million equal the value PropCo Acquired Assets.

88. This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201-2.

89. The Court entered an order requiring that the Fair Market Value of the PropCo real estate be determined by the PropCo Trustee. The Trustee's valuation was never disclosed to the Bankruptcy Court until it was filed by Plaintiff Eric L. Moore.

90. Copper Property Trust filed with the SEC, but not with the Bankruptcy Court that the fair market value of the PropCo real estate was $1.93 Billion as of the Effective Date.

91. The liens on PropCo collateral attach at the Fair Market Value of these assets, not at the Credit Bid Amount of $1 Billion. The beneficiaries of PropCo are the DIP Lenders and 1st Lien Parties.

92. Accordingly, Plaintiff, and all others similarly situated, are entitled to a declaratory judgment that the Fair Market Value of the PropCo real estate was $1.93 Billion as of the Effective Date, and not $1 Billion as the DIP Lending Parties allege.

93. Such a declaration will serve the twin interests of judicial efficiency and cost effectiveness by terminating the substantial and actual controversy between the parties, or resolving some part of it.

**COUNT II**

**(Copper Property Trust and Penney Intermediate Holdings LLC – Declaratory Judgment Under 28 U.S.C. § 2201(a))**

94. The allegations set forth above are incorporated herein by reference.

95. An actual legal and substantial controversy exists between the parties regarding the nature of the transaction–namely, if an auction, private sale or liquidation occurred.

96. The Sale Order is clear that the transfer of substantially all of the Debtor's assets was not the result of an auction. No auction occurred. This was a private sale and/or a liquidation. The Sale Order reads in part:

> **Private Sale is Appropriate.** The sale of the Acquired Assets to the Purchasers pursuant to a private sale is authorized pursuant to section 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004(f). A private sale of the Acquired Assets to the Purchasers represents the sound business judgment of the Debtors and is appropriate in light of the facts and circumstances surrounding the Transaction and the Debtors' chapter 11 cases because (i) it provides fair and reasonable value for the Acquired Assets for the benefit of the Debtors' estates, (ii) it avoids the cost and delay associated with conducting a public auction, and (iii) the Debtors reasonably determined that a higher and better bid could not be obtained by an auction in light of the robust pre- and post petition marketing processes and the other facts and circumstances of these chapter 11 cases. Notwithstanding that the Transaction provides fair and reasonable value for the Acquired Assets, the face amount underlying the Credit Bid Amount does not control the value of the Acquired Assets for tax reporting purposes, which shall be determined pursuant to paragraph 49 of this Order. (Dkt. 1814, Page 7-8, Section K.)

97. At the September 4, 2024, hearing, attorney for the Wind-Down, Ian Peck of Haynes and Boone LLP also stated that a private sale occurred.[51]

98. Despite these admissions, Copper Property Trust continues to use auction-like references to cloak the transaction as fair and competitive. They suggest that an auction occurred,

[51] See the September 4, 2024 Hearing Transcript, Page 62, Line 12

with the $1 Billion credit bid emerging as the "highest and best offer" for substantially all the Debtor's assets. They assert that as a result, the 1st Lien Secured Bonds are due only 10% recovery because only 10% of the credit bid was 1st Lien secured collateral.

99. However, because there was no auction and because a credit bid in a private sale cannot garner more in value than the amount of the lien being credit bid, the 10% recovery alleged for 1st Lien Holders would only apply up to $1 Billion in collateral. The remaining $7 Billion would be distributed in order of absolute priority, unencumbered by the DIP Loan.

100. Accordingly, Plaintiff, and all other similarly situated, are entitled to a declaratory judgment that no public auction of the Debtor's assets occurred. Rather, a liquidation and/or private sale occurred.

101. Such a declaration will serve the twin interests of judicial efficiency and cost effectiveness by terminating the substantial and actual controversy between the parties, or resolving some part of it.

## COUNT III

**(Copper Property Trust and Penney Intermediate Holdings LLC – Declaratory Judgment Under 28 U.S.C. § 2201(a))**

102. The allegations set forth above are incorporated herein by reference.

103. An actual legal and substantial controversy exists between the parties regarding whether the Honorable Judge Marvin Isgur approved a settlement agreement in which 90% of the Debtor's assets were assigned to the DIP Lenders, regardless of the value of those assets, and regardless of the amount of the DIP debt/liens.[52]

104. The Wind-Down Debtors and Brian Kinney, attorney for the overpaid DIP Lenders, allege that the purchase price of the PropCo real estate was $1 Billion because the $1

[52] And in violation of *In re: AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984)),which says that all pre-plan settlements must comply with absolute priority.

Billion Credit Bid was used to buy just that asset. They simultaneously attempt to justify the transfer of other assets that were not paid for, as being subject to a Settlement Agreement in which a 90/10 split of ALL of the Debtor's assets applies, regardless of value, and regardless of the liens belonging to Secured 1st and 2nd Lien Parties. This is simply not true.

105. Accordingly, Plaintiff Eric L. Moore, and all others similarly situated, are entitled to a declaratory judgment that: The Honorable Judge Marvin Isgur did not approve a Settlement Agreement between the two DIP Lending Parties that divides and distributes of all of the Debtor's assets on a 90/10 basis, regardless of value, and irrespective of the liens held by 1st and 2nd Lien Secured Parties that are still attached to the the Opco and PropCo Acquired Assets, up to the amount of these Creditors' remaining unpaid claims.

106. In part, U.S. Code § 1129(b)(2)(i)(II)(ii) provides:

> ...that holders of such claims retain liens securing such claims, whether the property is subject to liens is retained by the Debtors <u>or transferred to another entity,</u> to the extent of the allowed amount of such claims; (II) that each holder of a claim of such class receive on account of his claim deferred cash payments totalling at least the allowed amount of such claim, of of a value as of the effective date of the plan, of at least the value of such claim, for the sale, subject to section 363(k) of this title, of any property that is subject to liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) of (iii) of this subparagraph; or (iii) for the realization by such holders of the indubitable equivalent of such claims.

107. Such a declaration will serve the twin interests of judicial efficiency and cost effectiveness by terminating the substantial and actual controversy between the parties, or resolving some part of it.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Eric Lyndell Moore and Joinder Parties respectfully request that the Court enter judgment in favor of Mr. Moore and Joinder Parties as follows:

(a) **<u>On Count I</u>**, declaring that (i) the Fair Market Value of the PropCo real estate was determined by the PropCo Trustee, GLAS, to be no less than $1.93 Billion, and (ii) per the Sale Order, Disclosure Statement and Settlement Agreement, the PropCo Securities and PropCo Closing Cash must be distributed based on Fair Market Value, not the underlying $1 Billion credit bid amount, and (iii) that the 1st and 2nd Lien Parties were/are secured by the remaining PropCo assets at Copper Property Trust up to the amount of their respective unpaid claims.

(b) **<u>On Count II,</u>** declaring that (i) no public auction of the Debtor's assets occurred and (ii) a private sale and/or liquidation occurred, and that (iii) absolute priority and *in re AWECO* are applicable to all distributions of the Debtor's assets, including those that are subject to the Settlement Agreement.

(c) **<u>On Count III,</u>** declaring that (i) the Honorable Judge Marvin Isgur did not approve a Settlement Agreement purporting to give 90% of the Debtor's assets, regardless of value, to the DIP Lenders, and (ii) that liens belonging to the 1st Lien and 2nd Lien Parties were, and still are, valid and attached to the assets and/or proceeds currently in the possession of Copper Property Trust and Penney Intermediate Holdings LLC, up to the amount of their remaining unpaid claims plus interest, and/or (iii) imposing a constructive trust for the benefit of the unpaid/underpaid secured and unsecured Creditors.

(d) Granting Plaintiff, Eric L. Moore, Joinder Parties and similarly situated creditors such other relief as the Court deems appropriate under the circumstances.

Dated: October 30th, 2024

Respectfully submitted,

ERIC L. MOORE
/s/ *Eric L. Moore*
Eric L. Moore
202 Island Avenue
San Diego, CA 92101
Telephone: (336) 671-2193
Email: moorelyndell7@gmail.com

*Pro se*

**CERTIFICATE OF ACCURACY**

I hereby certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.

/s/ *Eric L. Moore*
Eric L. Moore

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30th, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Eric L. Moore*

Eric L. Moore

**MILBANK LLC**

Brian Kinney
Dennis F. Dunne *(admitted pro hac vice)*
Andrew M. LeBlanc *(admitted pro hac vice)*
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
bkinney@milbank.com
ddunne@milbank.com
aleblanc@milbank.com

Counsel for DIP Lenders/Copper Property Trust (PropCo)

**AKIN GUMP STRAUSS HAUER & FELD**

Marty L. Brimmage, Jr. State Bar No 00793386;
S.D. Tex. No. 30464
Lacy M. Lawrence State Bar No. 24055913;
S.D. Tex No 995675
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com
Ira S. Dizengoff *(admitted pro hac vice)*
Philip C. Dublin *(admitted pro hac vice)*
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
pdublin@akingump.com

Counsel to Minority DIP Group

**JACKSON WALKER L.L.P.**

Matthew D. Cavenaugh (TX Bar Bo. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
mcavenaugh@jw.com
jwertz@jw.com
kpeguero@jw.com
vpolnick@jw.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

Joshua A. Sussberg, P.C. *(admitted pro hac vice)*
Christopher Marcus, P.C. *(admitted pro hac vice)*
Aparna Yenamandra *(admitted pro hac vice)*
Sarah R. Margolis
Michael A. Sloman
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
christopher.marcus@kirkland.com
aparna.yenamandra@kirkland.com
sarah.margolis@kirkland.com
michael.sloman@kirkland.com

Co-Counsel to the Debtors

**FOLEY & LARDNER LLP**

John P. Melko
Jennifer Huckleberry
Harold L. Kaplan
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmelko@foley.com
jhuckleberry@foley.com
hkaplan@foley.com

Counsel for Wilmington Trust

**KEVIN M. EPSTEIN**
**UNITED STATES TRUSTEE**
**REGION 6**

1100 Commerce Street, Room 976
Dallas, Tx 75242
Telephone: (214) 767-8967
Facsimile: (214) 767-8971
kevin.m.epstein@usdoj.gov

**MILLIE APONTE SALL**
**ASSISTANT U.S. TRUSTEE**

515 Rusk, Suite 3516
Houston, Texas 77002
Telephone: (713) 718-4650
Facsimile: (713) 718-4670
millie.sall@usdoj.gov

**HECTOR DURAN**
**OFFICE OF THE U.S. TRUSTEE**

515 Rusk St Ste 3516
Houston, TX 77002-2604
Telephone: (713) 718-4664
Hector.Duran.Jr@usdoj.gov

**BRIAN R. HENAULT**
**OFFICE OF THE U.S. TRUSTEE**

515 Rusk St Ste 3516
Houston, TX 77002-2604
Telephone: (713) 718-4653
Facsimile: (713) 718-4670
Brian.R.Henault@usdoj.gov

**GLAS TRUST COMPANY, LLC**

Jeffrey Schoenfeld
Yana Kislenko
Irena Goldstein
3 Second Street, Suite 206
Jersey City, NJ 07311
Telephone: (201) 839-2187
jeffrey.schoenfeld@glas.agency
yana.kislenko@glas.agency
irena.goldstein@glas.agency

Copper Property Trust Trustee

**MCDERMOTT, WILL & EMERY**

Jonathan Levine
One Vanderbilt Avenue
New York, NY 10017-3852
United States of America
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
jlevine@mwe.com

Counsel to Copper Property Trust Trustee

**HILCO JCP, LLC**

Larry Finger
5 Revere Drive, Suite 410
Northbrook, IL 60062
Telephone: (703) 244-4588
lfinger@ctltrust.net

Manager of Copper Property Trust

**THE HONORABLE JUDGE MARVIN ISGUR**

Courtroom 404
515 Rusk
Houston, TX 77002

**HAYNES AND BOONE, LLP**

Ian T. Peck, State Bar No. 24013306
Eli O.Columbus, State Bar No. 24028062
Jordan E. Chavez, State Bar No. 24109883
2801 N. Harwood Street, Suite 2300
Dallas, TX 75201
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
ian.peck@haynesboone.com
eli.columbus@haynesboone.com
jordan.chavez@haynesboone.com

Co-Counsel for the Wind-Down Debtors

**PENNEY INTERMEDIATE HOLDINGS LLC**

% Simon Property Group
Attn: Legal Department
225 West Washington Street
Indianapolis, IN 46204

-and-

% Brookfield Properties
Attn: Legal Department
Brookfield Place New York
250 Vesey Street, 15th Floor
New York, NY 10281
Telephone: (212) 417-7000

Defendant

**SIMON PROPERTY GROUP**

Attn: Legal Department
225 West Washington Street
Indianapolis, IN 46204

Defendant

**BROOKFIELD PROPERTIES**

Attn: Legal Department
Brookfield Place New York
250 Vesey Street, 15th Floor
New York, NY 10281
Telephone: (212) 417-7000

Defendant

**H/2 CAPITAL ADVISORS**

Attn: Legal Department
301 Tresser Boulevard
Suite BSMT
Stamford, CT 06901